The next matter, number 241317, number 241318, number 241385, the Association to Preserve and Protect Local Livelihoods et al. versus the Town of Bar Harbor and Charles Sidman et al. At this time, would counsel for the appellants, Cross-Appley's Association to Preserve and Protect Livelihoods et al. please introduce themselves on the record to begin. Timothy Woodcock for the Association to Protect and Preserve Local Livelihoods et al. Could you just move your microphone a little closer to you? Certainly. Thank you. Timothy Woodcock on behalf of the Association to Preserve and Protect Local Livelihoods as well as the Peer Owners and the Tender Owners. You can begin. May it please the Court, I'm here representing the clients I just identified, and with me is the counsel, John Benner. John is going to be presenting arguments on the Supremacy Clause issues. I'll be concentrating on the Commerce Clause issues. We, of course, adopt one another's arguments, and we are certainly both able to address questions across the board on the issues presented here. We would respectfully ask the Court for one minute of rebuttal time. You may. Your Honor, I have four points that I would like to try to address for the Court today. One is the purpose and effect of the ordinance at issue here today. The other is the protection that the Adornment Commerce Clause affords for the right of continuous transportation or otherwise characterized flow of commerce, and also the standard of review, the heightened standard of review that applies to state laws and ordinances that interfere with the flow of commerce, and under also the application of the bike test. And the last point that I would like to address is that both the reasoning of the Court and the logic of the statute that is the ordinance itself, in a variety of ways, defy the application of limiting principles. Before I turn to the substance of my arguments, the Court did reserve an issue that was presented in late November and December, which is the submission by the Apple appellants of a supplemental appendix, which included a civil complaint that had been filed in the State Superior Court challenging the effectiveness of Chapter 52, a newly enacted ordinance by the Town of Bar Harbor. And if it pleases the Court, I could address that, I think, very succinctly right now. And so with the Court's permission, I'll go ahead and do that. So the question of the issue was the submission of a civil complaint challenging the validity of Chapter 52. That was submitted because the Town, in its brief to this Court, alleged that the seafare preemption issue had been mooted by the Town Council's enactment of Chapter 52. Of course, we would like the Court to accept the submission of the civil complaint. However, in looking at Chapter 52 as enacted, we think you actually can resolve the mootness issue just by looking at Chapter 52. And so I commend the Court's attention to two aspects of Chapter 52. One is the land-use ordinance in the Town of Bar Harbor is set forth at Chapter 125. That covers the entire land-use ordinance. Can I make a suggestion? Because the Dormant Commerce Clause issue is quite a significant issue. And if we need supplemental briefing to address this issue, we can do that with the follow-up order to the extent. But I think I'd rather you spend your time getting into the Dormant Commerce Clause issue, unless my colleagues have an objection to that. No, I appreciate that, Your Honor. If I could just make one single point on that, and that is Chapter 52 does not provide a mechanism for differentiating between seafarers and all disembarking persons of other types. So with respect to the Dormant Commerce Clause issue, first, we know the purpose of this ordinance. We know the purpose of this ordinance because the District Court told us what it was. In its amended decision, it said it was drawn with the capacity of cruise ships and mines. And in its order denying our request for injunctive relief pending appeal, it was even more direct, and I would quote from that order. It remains the case that the ordinance is almost entirely capable of achieving the end for which it was drawn, that is stemming the tide of daily cruise ship visitation to vessels with lower berth capacities of 1,000 or less. That's the purpose of the ordinance. Now, as the Court is aware there, perhaps the most unerring indication of an ordinance attempt is its effect. And the Court's decision, the amended decision by the Court, is replete with examples of the impact of this ordinance on cruise ship visitation. So, for example, the Court held or found that the ordinance would exclude 80 to 90 percent of cruise ship visits, and these are for cruise ships with 1,000 persons or more. And even with combined visits, say, for example, you had two cruise ships that came in at 750 each, they would also be covered by this. Well, to put this in some perspective when we're talking about effects, Bar Harbor is a town of, what, roughly 5,000 people? Yes. And some of these cruise ships are of a population of 5,000 or more? Yes, people. So what we're talking about is the entire population of town doubled. It's like 8 million people showing up in a day in New York City. And the question in my mind is, does the Commerce Clause really prevent the town from doing something about that to modulate that flow of people descending on the town, given that volume relative to the size of the town? I think where the Commerce Clause comes into effect, Your Honor, is where the ordinance essentially draws a line at the town pier and says, you may not pass. There are a whole series of Supreme Court cases that say that the point at which a state is most at risk for violating the Dormant Commerce Clause is when it draws a line at the border. And I might add in that regard, Your Honor, in the case of Commonwealth versus Virginia, the court observed in that case it was a state law that required segregation of passengers based on race once they entered the state of Virginia. And the Supreme Court said that no state can bar the transportation of passengers across its border. So suppose a cruise ship showed up with 50,000 people on board. Yes. Right. Is your analysis that the town would have to let, in a single day, all 50,000 people come in across the pier into the town? I think the question that the court is asking really directs itself to what standard of review happens under certain circumstances. So let me back up just a little bit because I appreciate the court's question. The historical experience of Bar Harbor with cruise ship disembarkations has been that they have managed that disembarkation. So there have been, at some point, seizures. Sure, they managed it by consent with negotiating with it. But my question is, given your Commerce Clause analysis, would the town be without recourse if 50,000 people showed up in one day? The town is not without recourse if the circumstances presented implicate a vital necessity for management. And there is no alternative reason to deal with it. What is it? I did have that same question. It's an attractive town near a beautiful park, and they don't want to turn it into an amusement park. And so we have national parks, we have state parks, we have local parks. Many of them have closing hours. Many of them have restrictions of where you can put a campfire or where you can't. They're regulated like mad in order to preserve the beauty of the place. And so here, Bar Harbor says, we want to preserve the beauty of our town, which is beautiful. And so the way that we're going to do it is we are going to keep out over a certain number. Now, if all these other places can do it, and we know they do, why can't Bar Harbor? Why can't they keep out too many people? I think if you're talking about the difference between a municipality and a national park, I think that's a significant difference. Well, of course, there's a difference because there is, in fact, a statute with a national park. But I wasn't just talking about that. That's why I put in state parks. That's why I put in, you can go out to Central Park and see what time it closes. You can go out to, there are a lot of places that close at particular times. I mean, you see the point. The point is they have an interest. And not only is it an interest, but it's an interest that is recognized throughout the country in all kinds of situations. So why can't they do it? I think if you're talking about a state park or a national park, that's fundamental. I'm talking also about local parks, like Rossy Playground, where I used to play when I was 8 years old in San Francisco, and like Ballard Boulevard, they had a fence around it. And they closed that park too, and it belonged to San Francisco. Your Honor, I think there's a fundamental distinction between a state park, a local park, or a national park. Are you saying a local park can't say closing hours, no campfires, no cars, after 6 p.m.? The distinction I'm drawing is between parks and municipalities. I thought your distinction was between closing it to everyone and closing it to people from a certain mode of travel. Your Honor, that is our issue. That's how you get to Southern Pacific. And the concern that rather than having just a pure congestion concern, they have a concern about congestion coming from a certain mode of travel. And the worry is that if they exercise that local interest, it has a burden on interstate commerce, which is too dramatic as to that mode of travel. The point I'm trying to make here is that it's not as though the town has no recourse whatsoever. And the recourse is? The recourse is if you have reached a point at which your need to manage this or even exclude has reached the level of an absolute necessity or a vital necessity. Boy, that's awfully strong. It has to be. It has to be. I mean, we have national parks all over the country, and I know it's a separate statute. But regardless, they close the area for camping and for access at different hours. That's awfully powerful. It sounds like almost never. Let's forget the almost never. Suppose, just for argument, you agree, you take that argument away. It's an absolute necessity for a second. But what can they do in order to keep the harbor not, let's call it for the moment, overcrowded? They can do what they have done, Your Honor. I mean, let me just explain. Well, they made agreements. They say the cruise ships won't agree. But I need to be able to make this point if I may, Your Honor. Please. What the town has done over the years is manage the – I mean, this is one of the things you can do with a cruise ship. You know when they're coming. You know how many people are getting on. But it's not like people coming in from buses and cars or whatever. You can actually plan for this, and they do plan for it. And over the years, and this goes back literally 20 years, they have managed it in a way that at no point in that period of time has the disembarkation of persons from cruise ships resulted in the realization of any public health risk. What does the record say about that? The record says that the police and the cruise ships and the pier owners all simply managed this, and the court essentially made no finding that at any point in that time period there were any health and safety risks. Let me ask you. This is one thing that's a positive. As I read the cases, when a local town is operating to take action that has a disproportionately strong effect or disproportionately is a complicated word, but a very substantial effect on a mode of travel, like in the passenger train car case, that raises a concern. Even after pork producers, they say pigs are not trained, so those flow cases are what they are. Some of those cases suggest that if the restriction is in aid of the commerce itself because it's to protect the safety of the people using the commerce, that's quite legitimate. That's not this case. There's no contention. This is for the benefit of the passengers on the ship, at least in this particular instance because the evidence is that it would stop all of them from coming. But we don't say that's dispositive. If you're not doing it for that purpose, you lose as a town. There is a concern expressed in the cases that if this is done just for the insiders, that worries us that you're not taking account of the needs of the passengers who don't have a vote in the town. So that's sort of present here. Yes. But at the same time, we've never said a town doesn't have only a safety interest. So this town has articulated a particular interest, which is we don't want to have too many people, and those people uniquely is presented when there's a crush of people that come all from one ship. What are we supposed to draw on to figure out whether they can do that? If it was a bunch of ships that were blocking a beautiful view, presumably the town would say, well, you know, we like our view. So if a bunch of ships are here, we can't have that many ships that block the view. How are we supposed to assess this from your perspective? I believe, Your Honor, you still have to start with a proposition that the Dormant Commerce Clause protects the right of continuous travel, and that's a paramount right protected by the Dormant Commerce Clause. And it's not as though the town may not have some way of dealing with that. It's that if they are going to deal with it, they need to meet a high standard. So, for example, in this case, it's a 1,000-person limit for every day of the year, irrespective. And yet the court findings were that 60% of the cruise ship passengers come in September and October. So why do we have a 1,000-person limit in May? So this is an absolute bar. There should be no mistake about this. And just on the absolute bar point, the way that we think about whether a mode of travel is being barred, that we kind of take the market as it comes to us. In other words, there's this issue of when am I just saying, you change your mode of production, that's all that's at stake. Sometimes the court says that. Sometimes the court says, no, this is actually interfering with the mode of travel. In the passenger train car case, the court seems to take it as, well, whatever the market produced, if the market says it works best with this many cars, we take that as a given. Is your position that since the passenger cruise line market has developed in a way in which it works with 1,000-person berths or more, we just take that as a given? If it was 20,000, we'd take that as a given? You take it as given, Your Honor, unless the – again, with the notion that this law is stopping people at the border. Unless you can come up with a real reason why you have to do this. And there may be circumstances that would justify this that are not before the court today. And the reason they're not before the court today, Your Honor, is because for a period of 15 or 20 years, the town has always managed this. That kind of crisis situation that Justice Breyer was suggesting where you have – Well, when you say the town has always managed this, obviously the citizens of the town strongly disagree with you. They felt so strongly that they had a referendum. And they were concerned not just about your limited reference to safety and health, but they – you literally go from a town that one minute has 5,000 inhabitants and another minute has got another 5,000 coming in over the pier, and they say, that isn't what we want in our town. Right, but you're correct in that sense, Your Honor, except that I would say that in the justification for this, that you would look for the justification of this ordinance, the district court essentially ruled out public health and safety risks. And what it was left with was comparative tranquility coming out of Memphis v. Green. That was really the – It was left with? Comparative tranquility, which is a standard coming from the – well, it's quoted in the district court decision. But essentially, the ordinance was serving the interest of comparative tranquility as set forth in Memphis v. Green. You know, I don't think Boston could – I mean, somebody wants to take their motorcycle across the common. And Boston says, what? Well, they all come from Rhode Island. Oh, my God, that's worse. If they want to take their motorcycle across the common, well, then we can – they have to be able to do it, unless it's really important not to. My grandchildren would say, it's really important to let us take our scooters. Do you see the point that I'm making? I do. And the reason it's so tough for me is because I find all these court cases all over the law. Oh, yes. And it's very hard to get something through. I hear you. But I do think the right of continuous transportation is set forth in a whole series of cases and is well-documented. What case refers to the right of continuous transportation? Well, I guess I would say the most direct description of it is in Wabash-St. Louis and Pacific Railroad v. Illinois. And that's exactly what it is. The right of continuous transportation is an essential element of commerce and is one of the purposes for which the Commerce Clause was adopted. Obviously, I'm paraphrasing, but you will find that. And Wabash, of significance, was cited by Exxon as a case exemplifying the significance of the flow of commerce. So that is preserving the flow of commerce. So if I have a town park that's got picnic benches for 50 people and room for another several hundred, I can't, and you and 50,000 of your friends show up saying right of continuous transportation, we're going on to that park, I've got to let you onto it? No, the right of continuous transportation allows you to go into a state or through a state. So with respect, for example, there are two cases that are right on point. So they can get on the pier, but they can't get off the pier? No, once they get on the pier, which the Commerce Clause allows them to do, you can manage them. So, for example, once they disembark and they go up to a park, the park can face limitations on them. What you can't do is what this ordinance does, which is draw a line at the edge of the town so you cannot come in. Or, to work through indirection here, we are affecting the instrumentalities of commerce in both the pier and the pilots and the cruise ships and the tender vessels, that you cannot come across the border. So I'm confused here. You say they should let them onto the pier, into the edge, they cross over onto the pier, they step down off the pier in the town, the town could then fence and cabin in 5,000 people there and let 1,000 apiece into the town? Well, I think in terms, well... Is that what you're saying? No, I think it would... Or let 1,000 in. The conditions on the ground, you would think, would respond to whatever the demand on public resources would be. And who would make that judgment? Pardon? And who would make that judgment? Largely, the town would make that judgment, but it would be based on the town's perception of health and safety risks posed by the disembarking persons, which is exactly what they've done over the years. That's exactly what they've done. They simply manage the disembarkation and reembarkation of these people. And just, if I could just one moment here, Your Honor. Going up to the park, so Justice Breyer, with respect to the park, there would be no problem. Once you have disembarked, if the town of Bar Harbor wanted to say, you know, the local park is at capacity or off limits, that's fine. Once you have disembarked, you are under the police power of the town. What you cannot do is draw a line. Well, draw a line under the police power of the town? I mean, can you keep the people out who have come up here from the south, but not keep the people out who have come, let's say, from Maine, which is a state, or who have come from Massachusetts, which is a nice state. You can't keep them out, but you can keep all these others out? But that's actually a very interesting way of putting the question. So, for example, what if the town of Bar Harbor said, well, we're okay with cruise ships, but we are not okay with buses? So we're going to put a line around the exterior of the town on the landward side. And they do that. If you run into the same situation. You can say, you don't have to answer this like a legal answer, but it did make me pretty curious. Are there practical ways that Bar Harbor can get what it wants? You're interested in your clients. But there are a lot more people than that. I mean, the national parks up there and the state parks are very beautiful, and they want to keep them not too many people. So what can they do? Well, I think if you're talking about whatever the town can do, it has to be consistent with what the dormant commonwealth can do. Well, I understand that. But I'm looking at the reason I raised the question for your colleague, but not for you. Because I don't think there's too much of a record here on exactly what the practicalities are of what they can or cannot do or what they might have tried. And there is, as Judge Barron said, there is a problem here where it's only certain people. It's only certain people who are not being able to get in. Can I ask you about that? That last point puzzles me. In the park example, it seems to me it would be problematic, at least as I read the cases, it doesn't mean it would be fatal, but it would at least raise a question if entrance was based on the mode of transportation that brought you to the park. Which is a different question than could certain modes of transportation go through the park, which would raise safety concerns. But parks filled up today unless you came by car, and then you can walk through the park. But if you came by bus, you can't walk through the park. That would raise all the kinds of concerns that you're saying this raises. And you're trying to say this is like this. The one difference is since they're coming by boat, the only way they can get in is through the pier.  So there's nobody else getting on except by the pier. Everybody's by boat. Right. So what are they supposed to do? Lots of people coming into that area of the waterfront all at once. They're all going to be coming by boat. That's how you get to the pier. So does that make it more legitimate for them to say, yes, we recognize it's a particular mode of travel, but it's a quite rational mode of travel to be focused on. The ones we don't on the pier are the ones coming by boat. So what's wrong with that? It would be rational to manage. It is not rational to exclude it altogether. That is the problem. Well, managing is saying 1,000 people a day. I mean, take Judge Barron's point a step further. Imagine a bus, big bus, shows up with 6,000 people on it each day. Wow. I think the town might be concerned about limiting the size of that bus that shows up each day maybe to 1,000 that will totally overrun the town. I think these kinds of questions really address a standard of impact. And where the arrival of persons in large numbers creates a risk, a really serious risk to public health and safety, then I think you're at the point where you may be able to justify a limitation. And the reason you say that is because the burden on commerce, as it happens given the way that market works, is that effectively you can't have passenger cruise ships. As if every town does this, that whole market goes away. And not every little town gets to decide that for the country. That's the basic case. I would look at it the way you want to win this case for the client and say, no, you can't do this. But it comes up in a lot of contexts. Trucks, okay, Congress passes a statute, there's an agency, and they work out the dormant commerce flows issues. It happens with trucks. It happens with national parks, state parks, and sometimes local parks. And I'm afraid in this case that following whoever creates some kind of rule that can very easily be applied in places where it doesn't belong. So that's why I'm putting the problem to you. I do appreciate that, Your Honor, and I think actually probably the most pertinent authority on this is the Southern Pacific case. And the reason it is is because there wasn't a set of competing surrounding jurisdictions with different standards. It's just a shame because in Southern Pacific the rule wasn't you can't get off the train. If it was, we would have a really easy time with this case, but they didn't tell us what they would do if the rule was you can't get off the train. They didn't go to that level, Your Honor. What I think is interesting about that case and very illustrative or illuminating, I guess I should say, is that there wasn't a situation that you ran into later on with the development of the trucking industry in Bibb and Raymond and Cassell where you had a lot of competing state jurisdictions. There weren't state jurisdictions with different rules. The force of the dormant commerce clause came in because that simply was an area that required national uniformity. And I think if you go back to the Tennessee, Illinois and Spirits case and they talk about the origins of the dormant commerce clause, they're talking about creating a national economy and protecting the arteries of commerce. This really is paramount. Will we have a national economy or not? I think stopping traffic at the state border, that you can't do unless you have a Maine versus Taylor type situation. Thank you, Your Honor. Thank you, counsel, at this time. Counsel for the Penobscot Bay River Pilots Association, please introduce yourself on the record to go. Let's begin. Thank you, Mr. Toomey. Good morning. May it please the court, I'm Jonathan Benner. I represent the Penobscot Bay and River Pilots Association appellants here and I'm accompanied by my colleague Kathleen Kraft. At the risk of giving somewhat short service to the preemption issues, which I think are very important here and are also independent reasons why this ordinance should be invalidated. In fact, the district court so found with regard to one element of our preemption argument. I would like to say, based on the colloquy with Mr. Woodcock, that a distinction here, I think everyone realizes it, but I'd hate for it to be lost between the problems we are facing and the hypotheticals about closing parks or monitoring load in a given jurisdiction or a given setting is that we're dealing with instrumentalities of commerce. Not only instrumentalities of commerce, but we're dealing with maritime instrumentalities of commerce, which have this historic, complex, imbued setting in the national history as being elements that are related very highly to the ability of the national government to make sure there are not impediments to commerce between the states, but also they have implications for the foreign policy of the United States. We have that situation at least implicated here because the vessels that are calling in Bar Harbor are largely, not completely, but largely are foreign flag vessels. And they are, like every vessel that calls in the United States, but particularly passenger vessels, subject to an extraordinarily complex network of permissions and inspections and authorizations and continuing inspections, and the effect of those federal inspections are that those vessels are entitled to call in the United States. And if they fail in some way to meet those inspections, then that privilege ends. But the situation we have here is the ordinance, by imposing an effective capacity limitation on these vessels means that those supposed... What Bar Harbor did was they said, you know, we've managed this very effectively with the cruise lines, and basically it's two ships a day, or three ships a day is what we had come to, 65,000 a month, I guess. What cashes out to, I don't know, what is that, a ship a day basically or something like that? Possibly. Let's say we worked it out and it's been a ship a day, but this has been voluntary for so long and we're sick of it being voluntary. We're going to make it mandatory. That's the rule, a ship a day. Can they do that or are you saying even that they can't do? I understand this case is unusual because your contention is the way this ordinance works, it's no ships. And I understand the burden that that places. But just as a management matter, sometimes the logic of your argument sounds like they can't even say a ship a day or two ships a day. So what is your position on that? I think that our constitutional objection to this, whether it's on the preemption side or on the commerce side, these things tend to run together at some point. But I think our constitutional objection to that is if the restriction imposed by the municipality makes it impossible for the ships to operate or has a very significant diminishing effect on the volume of commerce, then we've got a constitutional problem. Unless you have some very strong showing of debt on the other side. Yes. And as Mr. Woodcock indicated, we have cases where we've been punctilious about saying we are not arguing. And the district court had the impression we were. I don't know how the district court came to this conclusion. We're not arguing that the municipality has no recourse here. We acknowledge that using the powers of the police, they can manage people in the town to address the effects of tourism. And they aren't all caused by cruise passengers. The basketball tourists in Bar Harbor are not cruise passengers, at least numerically. So that's not the issue. The issue is what can the town do that permits them to focus on these vessels and to make it impossible for them to operate. And we argue that these actions vitiate the customs clearance that is given to these passengers when they arrive, that it diminishes or reduces or even eliminates the value of the federal anchorages that the ships are operating out of. And it has enormous effects, not just in Bar Harbor, but up and down the coast. And the issue came up in the colloquy with Mr. Woodcock, what happens if the next town does it? What's the limiting principle on when a town can impose a capacity limit? It's an effective capacity limitation on the vessels. At least when it would have the effect of destroying the market altogether, at least that's your contention. Yes, but it's not just the market. I don't think of it as a market. We have testimony in the record that there is competition between the cruise to the town of Bar Harbor. Clearly what the town has done is put a big thumb on the scale on that and said, well, the cruise side of that competition, we're not accepting that. But I thought the district court found there was no competition, they were not competitors. And are you challenging that fact-finding? Yeah, our position on appeal, Your Honor, and it's based on testimony in the record, that the cruise business is competing for leisure dollars, discretionary dollars for traffickers. It doesn't help us when you refer to testimony in the record when there's a finding by the district court, Judge. You have to argue that that finding was clearly erroneous. We argue that it's clearly erroneous, Your Honor. But having said that, the point I was going to is that this has considerable effects on commerce, a heavily regulated federal commerce. Its operation, and we have cited cases that say you must look at the effects, because if you didn't have to look at the effects, then we could just dress these things up any way we want and not worry about it. This has very strong negative effects on commerce. The capacities of the vessel follow them anywhere they go. If a vessel wants to be compliant with Bar Harbor's effective capacity limit, it has to take that capacity limit with it all over the world. How would you write it? I mean, I'm writing this from scratch. What I would do is I would say create an agency like the trucking agency and give them the power case by case to look over it and see if the Commerce Clause, they've gone too far, et cetera. But we don't. So we have to write some words here. And the words here, I don't think we want to write words or at least I don't want to write words that are going to give every park in the United States, regardless of who owns it, the power to bring in the people they like and not the people they don't like. I don't want to do that. And I don't want to do the opposite. I don't want to say that they have a constitutional right to turn the Sierra Mountains into a goodness knows what. Okay? So I don't want either of those things to occur. So what words do I write? My time has expired and I didn't respond. You have 30 seconds. Thank you. I'll get this written for you, I hope. No, I think what we're saying is that the case law provides ample room for municipalities to balance effects of trade within their borders. The issue we have, the only reason we're here, is because this town in this ordinance has reached out to limit instrumentalities of commerce, limit their access, undermine federal programs that govern their operation, undermine customs clearances, and it takes creativity. It's difficult in a federal regime. No, it's a little too hard. I mean, what you're saying, I'm thinking of words too far. And Holmes did that, in fact, in that mining case where he said, well, you can't regulate too far. And, of course, it's wonderful. Nobody knows what that means. And that's the kind of thing that you think is the case with my problem. This is too far. In a recent opinion by Judge Kayada, he used the term atomic fly swatter to discuss the misuse of the commerce clause. It seems to me here we have kind of an atomic fly. In other words, this is a big impact on commerce. And the implications for various municipalities or courts being able to do it, and, by the way, our friends at the other table, the intervener friends, have said no other court permits these cruise ships. They make very strong assertions about that. That's not true. No other court does anything like this. No other court limits the numbers to less than a commercial practicability of offloading vessels in order to drive the large ones away. Portland, for example, lets these cruise ships all come in. But Portland's population is 70,000 with 250,000, so you add 5,000 and one batch comes in in a few hours. The Portland citizens and government have decided they can handle that. They can build a big enough facility. They've got enough roads. They can do it. So you don't, but Bar Harbor's in a different situation. I still haven't heard from either you or Mr. Woodcock what Bar Harbor is to do when the 20,000-passenger cruise ship shows up, and they all want to get off at the same time. Fortunately, they aren't that big yet, but taking the hypothetical at that level, they manage the influx of persons into the town using the powers of the police. They can do so many things. Sure, so they say 1,000 a day can come in. Well, then the problem becomes, and the reason we're here, and the reason this is a federal issue is because they— But I think you're saying, you won't admit it, but I think you're saying they have to let all 20,000 across that pier. No, I'm not saying they have to let 20,000 across the pier. Okay, how many of the 20,000 can they not let across the pier? I don't think it can be reduced to a numerical solution. I think that's the problem. Well, I thought the idea would—unless I'm misunderstanding it, if they can't handle 20,000 people coming into the pier physically, they then have a legitimate interest in preventing it. If it would create a health and safety problem, they have a legitimate— What you're concerned about is comparative tranquility. Is that a good enough interest? If you can't show that we actually can't manage them coming in, if you can't show it presents a health and safety problem, if the market, the seafaring market, would allow a ship that big, the fact that the town doesn't want that many people in the town, is that a good enough reason for them to decide for the whole country that that market can't exist? I take it that's your point. Our position, we know it's not— Comparative tranquility is not a workable standard. It's a meaningless standard in this context. It may work in Memphis, be green and in equal protection. Because presumably Portland could adopt that view with respect to these ships, too. Yes, but presumably there's a possibility that will happen. One of the things we're very concerned about is this will metastasize and happen elsewhere. So what you're saying is comparative tranquility is not a particularly important— we should not deem it to be an important value for main communities. I would say it's an important value for all of us. But all commerce creates something that someone thinks is not tranquil. I mean, commerce by its very nature is dynamic commerce, is noisy commerce, causes delays of railroad. Commerce can be a problem to manage. But you have to manage it within the scope of municipal authority under the Constitution or state authority. If the state of Maine did something like this statewide, I think the Commerce Clause issues would be even more apparent. Thank you. Thank you. Thank you. Thank you, Counsel. At this time, the Counsel for the Town of Bar Harbor, please introduce himself on the record to begin. Thank you. May it please the Court. I'm Jonathan Hunter for the Town of Bar Harbor. Mr. Hunter, could you just move your mic up a little bit higher? Thank you. Absolutely. Is that good? Yes. Our Constitution allows different communities to live with different standards. Appellants in this case were all local businesses who benefit from cruise traffic, asked this Court to deny Bar Harbor that constitutional prerogative to preserve their own narrow interests. Cruise travel to Bar Harbor is relatively recent. It began in the 1980s and it's grown exponentially since then. With cruise lines sending ever larger ships in ever larger numbers. When these ships disembark passengers in the town, which occurs only at two piers that are basically right next to each other, it creates considerable and acute congestion problems, which dramatically impact the quality of life of people who live and work in Bar Harbor and other visitors. To curb these effects and protect their quality of life, the voters of Bar Harbor, which the Court has noted is a town of about 5,500 people, have chosen to limit the number of passenger disembarkations from cruise ships to 1,000 per day. That's a valid expression of the people of Bar Harbor's home rule authority. I think the logical end point of the appellant's arguments in this case is that port towns are constitutionally required to accept as many cruise ships as cruise lines and their local proxies wish them to, subject only to their physical capacity to do so. And I don't believe that is what the Constitution requires. I'm mindful that I have very limited time before the Court, so I'm happy to take the Court's questions. By the way, people in Savannah, I think in New York, in Baltimore, this is a trick question, etc. How did they vote? You're right, Your Honor. This was only a vote of the residents of the town of Bar Harbor. They're affected. Their vacations are affected. Their transport is affected. But they didn't vote on it. It's a town. They don't want them. I'm just noting that as a fact. And I'm asking about the record. The record clearly shows they didn't vote. All right, now you said police, health, safety, and even congestion. Forgetting congestion for a second, what does the record show about the other three? The district court found. I'm not saying that the district court found for a change. I can ask what I'd like to ask, and I want to ask what the record shows. The testimony of the town officials, the harbor master, and the chief of police, I believe was that they can physically manage this number of passengers they've got. All right, so they say so far this record is not favorable to you on that. It might be nothing, and it might be somebody saying something. Now, on congestion, what congestion? What is the congestion? Our harbor, we were told by one, I guess, or someone, the congestion is there, but it's not by the pier. It's up where the restaurants are, and it's up where all the little cafes and different things are. So this is slightly indirect. What do you think the congestion is that's shown? Yes, the congestion is the crush of people coming off of a large cruise ship. What does that mean? I mean, I understand that when they come off, there's a whole bunch of them. And then, I mean, having been on the cruise ship, you're kind of ready to get away from some people, so you kind of disperse. What does the crush mean? I don't fully understand. Are they just crushing everybody as they're coming through bars? That seems unlikely. Perhaps not that dramatic, Your Honor. But you might think that they would disperse quickly, but that's assuming they aren't. Why can't they just build ramps up? Can't they build ramps going to different places? Why can't they do that? I think they have made efforts on the land. All the ramps, I mean, I don't know. I don't want to go on my own observations, but I've been to places with cruise ships, and there are a lot of ramps. And so I see one amicus says to us, look what I'm driving at. I'm driving at one. We have one amicus who says to us, look, congestion isn't even there. It's up across the bridge. It's up where these other restaurants are, et cetera. Second, common sense suggests maybe you can build, if it's a crush, maybe you can build some anti-crush ramps or something. I don't know. Then I look at the health, safety, and police, and the record, although whatever she found, the record seems bare. And so one thought, which I'm not advocating at the moment, but one thought that occurs to me, my God, we have lots of methods of transportation. We have lots of safety agencies. I once read a case on the tonnage clause, and the founders were worried about places in this country blocking other citizens from the utility line. Okay, you see, all that's true. And so I see the record, which doesn't seem to go into that. Send it back. What do you think of that? Send it back. Say, okay, we have two very important values here. The case is all over the lot. This isn't like trucks because there isn't an agency directly in charge. And so let them build their record. Let them build it. In the meantime, maybe they'll settle. But let them build it, and let's see how harmful this actually is. And what do you think? Well, I'm going to think no. You've accurately predicted my answer, Your Honor. You know, I think the record is what it is, and it was the party's best efforts to build the record in this case. And I think one thing that you will not find in the record is any evidence that there's any impact outside of the town of Bar Harbor or what that impact will be. I thought the impact was that 90% of all cruise ships wouldn't be able to have any port of call there. The district court did find that. So presumably if every town then adopted the same rule, that would be 90% of the means of travel would go away. Well, no, because other towns do have other limits. But they could all adopt this limit, couldn't they? They could. Rockland only allows six people. You don't know how people feel in the South. In Savannah they're saying, my God, my whole life I've wanted to see Bar Harbor. And you're saying you're not hurt when you tell them that it's a really tough job. Take your car. What car? I'm having a hard time. It's in the shop. I do see the point. I do. And may I answer your question? I think the cases are quite clear that, and this typically comes up in the right-to-travel context, but burdens on one method of traveling don't implicate individuals' right to travel. They just don't. But Southern Pacific clearly suggests that burdens on one mode of travel is itself a problem under the Dormant Commerce Act. I think the concern that the court had in South Pacific and the other trucking and train cases was trucks and trains, which are a form of point-to-point transportation of cargo and goods, they were being stopped at the border and either have to – They weren't being stopped at the border. Well, they had to stop and reconfigure – You didn't have to stop at the shipyard and make it less than 1,000 birds. Well, no, because they can simply go elsewhere or they can discharge 1,000 passengers. Where can they go with their passenger berths if the next town doesn't let them? Many of the towns don't let them go there. And I think if there is an impact like that, I don't think – if you look at the Supreme Court's recent opinion in Ross, I don't think this court should – The court cautioned that the Dormant Commerce Clause is to be applied with extreme caution, and I think that's a policy-making decision for Congress. That's the question. The difficulty here is these cases – You can read them, as you say. I mean, absolutely. But they're not – There are different problems. They come up in different ways. Balancing is all over the place. It uses different – There's pike, there's this, there's that, there's the other thing. So if we look at this thing here and see it is somewhat open, then we have, one, the people who are adversely affected can't boat. We have, two, a lot of the people who would like to come up to Maine and here can't do it because the cruise ships are cut off. Three, we supposedly can come in other ways, but some of us can't afford the other ways or the time doesn't work out or it's difficult for us. And four, we could get our own sailboats, but to tell you the truth, we don't have the money. And so you see a certain number of harms. And you also see, I think at the beginning, are considerable benefits to maintaining what you call tranquility. Fine. Fine. Think of the Sierras. Think of the mountains and the plains, you know. Think of the folks. Of course. So I found this rather difficult, and that's why I was looking at things for sending back to get a more complete record so that we have more to go on. Well, okay. You said, well, we made the record we can, so that just puts me in a really tough position. Can you think of anything else? Well, I think one thing I think is significant in this case, Your Honor, is sort of the proxy nature of this whole battle that we're fighting here. The harms, I mean, this court has focused on harms to individuals outside of the state who wish to travel there. First of all, that's overwhelmingly not how people come to Bar Harbor. It doesn't even stop people from traveling there by cruise ship. That's correct. The cruise ship company itself doesn't let you get on board unless you buy a ticket, and the more you want to do, the higher-priced ticket you have to pay for a different berth or whatever. The cruise ship can still go to Bar Harbor. The only regulation is that they can only sell a thousand, half a thousand their passengers get off, so you may need to pay more for your ticket to be among those thousands. That's exactly right, Your Honor. I think in the Portland Pipeline case, which I recognize is a district court case, but I commend it to Your Honors. I think it's very helpful in looking at this case. The district court noted that if any regulation, any local regulation, particularly if a big industry is going to have impacts outside of the state, it's going to impact commerce in some way. And, you know, for example, if Bar Harbor banned fireworks and everywhere else banned fireworks, then the market for fireworks would collapse. And you may say, well, what about the trucks and trains cases? Well, I think in this case the cruise ships are more like fireworks than they are like trucks and trains. They are the product. They're what's being sold. It's not just the means of transportation. It's an experience. It's a vacation product. And if that, you know, even if, and I don't think the record shows this at all, that there will be some massive impact on cruise travel elsewhere, but even if there were, I don't think the Constitution is concerned if that market happens to dry up. Can I ask one last question, at least from me? The 1,000-person-a-day rule is over the course of the whole day. And that 1,000-person-a-day rule is also set for cruise ships with more than 50 passengers. That is the definition of a cruise ship. It's out of more than 50. So what is the significance of that for the logic of this? Because many cruise ships or passenger ships can come to Bar Harbor with lots of people coming off the pier who can all be there. And Bar Harbor doesn't seem to have a problem with it unless they're coming from these large cruise ships, even if over the course of that day that resulted in more than 1,000 people being in Bar Harbor. What are we supposed to do with that feature of the case? I think two things, Your Honor. One is that the town doesn't have to strike at all with the negative impacts of all different forms of travel all at once. It can manage these separately, and it does. The other is, and this is a difficult case to Your Honor's point about the record, this was a popularly initiated citizen initiative that, you know, by its nature, it doesn't have legislative findings and that kind of thing supporting it. But it is the product of many years of experience and back and forth and different attempts to manage this problem in the town. And the town, throughout its experience, you know, it has tried caps of 3,200, and those were not sufficient. So I think this is a rational way for the town to get at this particular problem, which is very unique, which is all of these cruise passengers are coming all at once to two different, two piers that are right next to each other, very near the downtown. Thank you. Thank you. Thank you, Counsel. At this time, will Counsel for Appalachia Cross Appellant Shidman please introduce himself on the record to begin. Hello, Your Honors. I'm Attorney Bobby Papazian, here for Defendant Intervenor Charles Shidman. And I would first like to say that it's an honor arguing for this Court and particularly this panel and the return of Justice Breyer as an unexpected delight. So I'm here representing Charles Shidman. And although my client was the principal architect of the ordinance, the ordinance was passed by the vast majority of residents who weighed relevant commercial and non-commercial interests and ultimately decided in favor of improving their local welfare. The growing problem of cruise ship tourism is not isolated to Bar Harbor, but the Bar Harbor is an untenable situation, which demonstrates the danger of forcing a small town to accommodate the business model of cruise lines employing ever larger cruise ships and disembarking passengers in unprecedented scales. Boston might be able to handle those types of numbers, but Bar Harbor residents, who number 5,200, I believe, can't access their own supermarket, downtown, or waterfront when a single cruise ship is in port. The land use ordinance was passed to limit and more beneficially regulate the volume and manner of passenger disembarkations and to avoid concentrations at one central location, downtown. These purposes are rationally aimed to reduce congestion, conserve municipal resources, and improve public safety and welfare. The appellants insist that they're only challenging this ordinance, but their arguments rely on broader attacks to the town's fundamental ability to regulate disembarkations at all and depend on cruise lines' unfettered access to disembark as many passengers as they may choose. The practical reality is that coastal towns everywhere limit or outright prohibit cruise ships from disembarking passengers all the time. The cruise ships industry is dependent on a host town's voluntary participation, not compulsion. The cruise industry doesn't get to dictate what a town looks like or what it must accommodate against its will. Nothing in the law protects the cruise line's preferred itinerary. I do want to address something that Justice Breyer mentioned about sending it back to develop a factual record. I don't think that's necessary because contrary to what both sides have said, the district court actually did find that the crush of people at the waterfront actually jeopardized safety at the waterfront. It isn't just words. It's what's actually going on here. Are the hospitals at risk? What does happen? That's relevant both to the importance of the interest that they're trying to protect with your ordinance and it is also relevant to the possibility of alternative ways that are less restrictive of doing the same thing. The reality is that there are actual safety dangers caused by the crush of passengers disembarking. I believe in our addendum 129 to 130, there was a town report that stated that even on light cruise ship days with 2,000 passengers disembarking, the town cannot safely contain passengers at the waterfront. There was testimony about residents having to walk into the streets to avoid the crush of passengers that take up the sidewalks. There's ample evidence in the record to support not only the safety findings of the court but also the findings that the ordinance advances the reduction, the goals of reducing congestion and town welfare. I know that the court had focused on the standard of comparative tranquility but comparative tranquility is not the standard here. It's public safety and welfare that the ordinance is meant to improve. Welfare is a pretty big word. Welfare is a big word and it's meant to encompass everything. Not everything, sorry. It's meant to encompass a wide variety of local measures to make the town more beneficial to not only those who live there but also people who visit. I know that the court is also focused on the right to travel and the court had mentioned that the ordinance is not meant to benefit those using cruise ships as a way of conveyance but it actually is. It's drawn to benefit not just the residents but the visitor experience. Visitors include those coming off of cruise ships. If somebody gets hit by a car coming off a cruise ship, that's going to detract from their experience in Bar Harbor. So in terms of the right to travel, the ordinance doesn't exclude a mode to travel. I know that my adversaries have framed it as completely excluding the right to travel but it doesn't. It still allows cruise ships to visit. It still allows cruise ships to disembark, just not necessarily on their business model's terms. That business model requires the disembarkation of their entire slate of passengers and their habit of using ever-larger cruise ships. They can reduce the size of cruise ships. They can create excursions to Judge Kayada's point. They can create excursions into Bar Harbor just like they create excursions for any number of other experiences. The truth is that the burdens on a single mode of transportation don't implicate the right to travel. And as for what would happen if other towns enact similar or varying limitations on disembarkations, they actually do. Most don't permit cruise ships to disembark whatsoever. If they did, we wouldn't be here because if Bar Harbor enforced their 1,000-person limit, then the cruise ships could just go to Tremont, which is down the road, still have access to Acadia Park. And if 1,000 persons are allowed in Bar Harbor, 500 in Camden, 5,500 in Boston, the cruise ship's business model would adjust to cater to those thresholds. It's not like they can't bypass a port. That's why these cases are different than the railroad cases or the trucking cases because you can't just bypass the railroad that goes through a state. Here, you could choose not to go to Bar Harbor and you could go to Rockland instead. And that's essentially what they're doing. They're adapting. And so will passengers and so will towns. And so the ultimate impact on commerce is uncertain in this case because what could happen and what will likely happen and what actually is happening on the ground is that more towns are willing to accept cruise ship disembarkations because they know that they're not going to be beholden to the cruise industry's model of ever larger cruise ships and ever more people in their town. Thank you. Thank you. Any more questions for me? Thank you, Your Honors. Thank you. Thank you, Counsel. We have a one-minute rebuttal. Please reintroduce yourself on the record to begin. Thank you, Your Honor. Thank you, Your Honor. Tim Woodcock again for Apple, the peer owners, and the tender owners. First, there should be no ambiguity on this. The record was developed really quite distinctively below. There's never been a health or safety risk here by the disembarking passengers. I should say a realized risk because the town has always accommodated that risk. They've anticipated that risk. The testimony of our cruise is clear. The lieutenant of the police department, Chris Warfel, who also happens to be the harbor master, said they simply managed the risk. Jim Ellis, the police chief, said there was no risk because of the way they managed it. Then one who had to step into the street, Nate Young, the former police chief, he said there was no risk posed by the disembarking passengers because they simply managed the risk. The town council chair said Bob Harbor would not have tolerated the higher limitations had there been a health and safety risk. That record has been well established. There is no record of what other towns are doing. Can I ask you a point about that? I think it's Chief Justice Hughes' opinion in the coal, in the train stove case where they regulated whether you could use a coal stove or a gas stove or an electric stove to keep the people warm on the train. And the concern was raised there, well, if this town can do it, then the other town has a different one, just like with the oil lamp on the train or the electric light on the train. And sometimes the cases say, well, we have to be worried. If every town did their own thing, that would destroy the industry. But Hughes, in one of the cases, says, well, the answer to that concern is if they all start doing it and it creates a big problem, we have a very good institution to solve that, which is Congress can step in and preempt everybody. But there's no need for the court to be the one to jump in first. So why is this a case where the court needs to jump in first rather than, just as they say, it's relatively uncertain what will unfold. If it unfolds in a way that all the towns operate in some way that destroys the cruise industry and Congress wants to preserve it, Congress is perfectly capable of stepping in and preempting. If that were the only choice, Your Honor, there would not be a self-executing Dormant Commerce Clause. There are areas of policy, and you mentioned Chief Justice Hughes and then Justice Hughes earlier. In his capacity as Justice Hughes, he was the author of the Minnesota Rape Cases. And in the Minnesota Rape Cases, he categorized a series of different ways in which states can impose what's allowed, what's not allowed. One of the things he identified as not being allowed is a state stopping the importation of legitimate articles of commerce at the border. So we are again back to this issue that we're talking about. What makes this case different is that the town is drawing a line at the border and saying you can't come in. And that's not been – I'm not aware of any Supreme Court precedent other than perhaps Maine v. Taylor where you can actually do that. It actually doesn't say that. It says 1,000 of you can come in today, 1,000 tomorrow. That just doesn't happen to fit the model of a cruise ship that has 5,000 people and doesn't want to sell excursion tickets to Bar Harbor. But you are still telling – let me put it this way, Your Honor. If you apply the standard in the Minnesota Rape Cases, is that 1,001st person not a legitimate article of commerce? And aren't you stopping that person right at the border? I mean, this is really, I think, no different than the effort of the – I think it was the Commonwealth of Kentucky who tried to limit the number of people who could be on the streetcars in the Covington case. So the difference in this case, there is no public health threat here. It has always been managed. We don't have to deal with questions of whether 20,000 people show up in a cruise ship because what we know is that 3,500 showing up or 5,500 showing up, depending upon the time of year, they manage that. They've done it for 20 years. So I do think the principle that is at stake here is the one that was articulated in the Wabash case, which is the right to continuous transportation is an area that is covered by the concept of the flow of commerce, and that is entitled to a high priority in preserving a national economy. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.